UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| JERMAINE CARPENTER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 12-CV-3352 |
| JAMES C. CLAYTON, et al. | ) ) ) |
| Defendants. | ) ) |

## OPINION

**TOM SCHANZLE-HASKINS, U.S. Magistrate Judge:**

Plaintiff proceeds pro se on this civil rights case regarding Plaintiff's access to mental health treatment and sex offender treatment at the Rushville Treatment and Detention Center. His claims are: (1) Defendants refused or delayed in providing sex offender treatment to Plaintiff after he consented to that treatment; (2) Defendants refused to assign Plaintiff a therapist; and, (3) Defendants failed to have an adequate procedure for Plaintiff to obtain help during a mental health crisis Plaintiff allegedly experienced when a resident on his unit committed suicide. (Judge Myerscough's 2/29/13 order, d/e 7.) The defendants are involved

in Plaintiff's mental health treatment. This case is not about retaliation against Plaintiff for Plaintiff's exercise of his First Amendment rights: that claim proceeds in another pending case before Judge Myerscough. Carpenter v. Clayton, et al., 13-CV-3073.

This case is now at the summary judgment stage, before this Court by the consent of the parties. After careful consideration of the parties' submissions, the Court concludes that Defendants' motion for summary judgment must be granted on all claims except the Plaintiff's claim about his delay in access to sex offender treatment after he consented to that treatment in September of 2011. The Court needs more information to make a determination on that claim. Accordingly, Defendants will be directed to file a supplemental motion for summary judgment.

**SUMMARY JUDGMENT STANDARD**

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the

nonmovant. "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010). "Summary judgment is appropriate when the admissible evidence shows that there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law." Taylor-Novotny v. Health Alliance Plans, Inc., 772 F.3d 478, 488 (7th Cir. 2014).

**FACTS**

Pursuant to the Illinois Sexually Violent Persons Act, 725 ILCS 207/1, et seq., Plaintiff has been detained at the Rushville Treatment and Detention Center since March 17, 2009. He was committed to the facility in August of 2013. (Plaintiff's Dep. p. 5.; Jumper Aff. para. 74.) When Plaintiff was admitted to the facility in 2009, he was assigned a primary therapist and a master treatment plan was developed for him pursuant to the standard procedures. Id. at p. 7.

In general, there are five phases to the treatment program at Rushville: "(1) assessment, (2) accepting responsibility, (3) self-

application, (4) incorporation, and (5) transition." (Jumper Aff. para. 68.) Participation in the treatment is voluntary, and a resident must sign a consent form to participate in the treatment. (Jumper Aff. para. 61.) Every resident receives a master treatment plan, updated biannually, whether or not the resident agrees to participate in treatment. (Jumper Aff. para. 63.)

Even if a resident does not consent to participate in the treatment plan, the resident still may put in a request slip to talk to a therapist. (Pl.'s Dep. pp. 22-24.) Plaintiff had a therapist assigned to him at all times until the facility changed to a "team" approach. (Pl.'s dep. p. 22.) Under the team approach, a therapist might not be assigned to a resident who has not consented to treatment, but that resident can still talk to a therapist by submitting a request. (Caraway Aff. paras. 17-18.) Plaintiff does not dispute that he "has had access to a therapist and an entire treatment team during his time at the Rushville TDF, including the time that he did not consent to treatment." (Jumper Aff. para. 85.) The treatment team consists of clinical therapists, health staff, and security staff. (Prezell Aff. para. 1.)

Plaintiff did not sign a consent to treatment until September 19, 2011, about two and ½ years after his placement at the facility. (5/2/13 treatment plan, d/e 87-4, TDF 471 (sealed)). Plaintiff did participate in an orientation group in the Fall of 2009 (which does not require a consent), but did not complete the orientation group because of absences due to behavior issues and rule violations. (Defs.' Undisputed Facts, 90-96.) Plaintiff completed the orientation group in April of 2010, but still did not consent to treatment at that time. (Defs. Undisputed Fact 103.)

After Plaintiff signed the consent form in September of 2011, Plaintiff was told that he would be put on a waiting list to get in treatment groups due to limited staffing and resources. (Pl.'s Aff. pp. 10-11.) "[T]hinking that [he] would be waiting for 2 or 3 yrs to get in groups or treatment the plaintiff kind of became discouraged and uninterested in treatment." (Pl.'s 11/7/14 Aff. p. 11, d/e 103-1). Plaintiff does not dispute that he then decided not to consent, a decision reflected in reviews of Plaintiff's treatment plan from January 26, 2012 to around March of 2013, which all state that Plaintiff had not consented to treatment. Plaintiff does not dispute that his Non-Treatment Resident Review dated 1/26/12 states that

Plaintiff "does not feel that he needs sexual offender treatment . . . ." (d/e 87-4, TDF 467 (sealed)).

Defendants "agree that certain groups and classes may be full at certain times for various reasons so that a particular resident may not be able to join a particular group." (Defs.' Response, p. 8, d/e 105.) Defendants also agree that "Plaintiff may have been placed on waiting lists at certain times to get into treatment groups." (Defs.' Resp. p. 11, d/e 105.)

On October 16, 2012, a resident living across the hall from Plaintiff committed suicide. Plaintiff was traumatized: he could see the resident's deceased body on the floor and staff in the vicinity were allegedly laughing. (Complaint, pp. 9-10). Plaintiff asked to speak to a therapist immediately but was told to submit a request. (Pl.'s Dep. pp. 24-25.) Before this incident Plaintiff had been able to orally tell a guard on the unit that he needed to see a therapist; the guard would relay the message, and the therapist would come. (Pl.'s Dep. p. 25; Pl.'s Affidavit p. 18.)

On October 17, 2012, the day after the suicide, Plaintiff was transported for a court hearing. On his return he was evaluated by a nurse per the standard procedure, with no abnormal findings.

(Jumper Aff. para. 132.) Several residents sought counseling after the suicide, but Plaintiff did not. (Jumper Aff. para. 98; Caraway Aff. paras. 4, 12.)

On October 19, 2012, Plaintiff filed a letter in a different case pending before Judge Myerscough, expressing his distress at the resident's suicide and the facility's response. Carpenter v. Saddler, et al., 12-CV-3227 (d/e 12, and also attached to the Complaint in this case). Shortly thereafter, on October 22, 2012, Plaintiff spoke to a therapist and felt better. (Pl.'s letter to Judge Myerscough, attached to Complaint; D. Kolbeck's 10/22/12 progress note, d/e 87-2, p. 21 (sealed)).

On an unspecified date after Plaintiff filed his letter with the Court, Plaintiff spoke to Defendant Caraway in passing about needing to talk to a therapist, get "back to rec groups and some other stuff," but Caraway did not follow through on her oral promise to come and see Plaintiff. (Pl.'s Dep. pp. 26-28.) Plaintiff did not file a request slip to talk to Caraway because he trusted Caraway to keep her word. (Pl.'s Dep. p. 28.)

According to the current handbook, if a resident is experiencing a mental crisis, the resident may notify the security

staff, who will then notify the treatment team. (Jumper Aff. para. 96.) The resident may also file a request to speak to a therapist. (Jumper Aff. para. 145.) Plaintiff contends that, before the handbook's revision in 2013, there was no written policy about how a resident could obtain emergency help in a crisis.

At some point before he filed the Complaint in this case, Plaintiff became interested in participating in treatment. However, Defendant Prezell informed Plaintiff that Plaintiff would have to complete a four week "mentoring program" before his sex offender treatment could begin. The mentoring group is not required for all residents, and Plaintiff felt that the mentoring group was only imposed on him to delay his treatment. (Defs.' Undisputed Facts 120-124; Pl.'s Aff. p. 13; 3/18/13 Non-Treatment Resident Review, d/e 87-4, TDF 484 (sealed)).

On March 5, 2013, Judge Myerscough held a status conference in this case because Judge Myerscough was concerned about Plaintiff's welfare based on a letter received by the Court (d/e 11). At that hearing, Judge Myerscough orally advised Plaintiff that he should complete the mentoring program so that Plaintiff could begin his treatment. After the court hearing, Plaintiff agreed to

complete the four-week mentoring group. Plaintiff completed the mentoring group and had to sign another consent form because his consent form from September 2011 could not be found.

In Dr. Jumper's opinion, the decision to require Plaintiff to complete the mentoring group was within the professional judgment of Plaintiff's treatment team, to ensure that Plaintiff was ready to commit to the treatment process and be receptive to change. (Jumper's Aff. para. 156.) According to Defendant Prezell, the mentoring group is "especially helpful to struggling residents because it provides them with opportunities to hone the skills and behaviors that they need for successful treatment . . . ." (Prezell Aff. para. 16.)

In April of 2013, Plaintiff began his sex offender treatment by attending the "treatment foundations group." (4/26/13 Group Progress Note, d/e 84-7, TDF 488; April 2013 Monthly Treatment Review, d/e 84-7, TDF 490 (sealed)). At the time of Plaintiff's deposition (September 17, 2013), Plaintiff was in two treatment groups ("autobiography" and "treatment foundation"), which met every week. (Pl.'s Dep. p. 13.)

At the time Defendants filed their summary judgment motion (7/14/14), Plaintiff remained at the "engagement level" of treatment, or phase one. Once "a resident has displayed and demonstrated the skills, practices, and responsibility necessary, the treatment team will recommend and move the resident from engagement levels to the phase two disclosure group. In the disclosure group, residents discuss their sexual offense histories and specifically describe their past sexual offenses. Residents are given at least one polygraph test to assess their level of honesty." (Jumper Aff. para. 81.)  In Defendant Jumper's opinion:

> To the extent that Mr. Carpenter has not advanced as quickly though the treatment process as he would prefer, it is evident that Mr. Carpenter's progress was affected by:  his failure to consent to treatment for several years, his history of committing major rule violations, his belief that he does not need any sex offender treatment, and his insistence on pursuing legal remedies before deciding whether to join treatment groups.

(Jumper Aff. para. 153.)

The behavior committee at the facility may place a resident on "close status" for various reasons, including rule infractions.  Close status means that a resident is confined to his room except for access to the day room several hours each day.  (Jumper Aff. para.

18.)  According to Plaintiff, when a resident is on close status, that resident's attendance in group therapy is generally suspended unless the behavior committee or the treatment team provides otherwise.  A resident on close status may submit a request to participate in groups, and then the "clinical and security staff . . . consult with each other and determine if he is stable enough to attend group." (Caraway Aff. para. 170.)  The process of obtaining permission to attend groups while in close status takes about two weeks.  (Pl.'s Dep. p. 15.)  The treatment team of a resident on close status decides "if it is safe for the resident to attend groups while on close management status." (Jumper Aff. p. 11.)  In Defendant Jumper's opinion, the treatment team must exercise its professional judgment in determining whether a resident may attend treatment groups while on close status.  (Jumper Aff. para. 155.)

Defendants maintain that Plaintiff withdrew from treatment at some point.  Plaintiff disputes this assertion and avers, without elaboration, that he was "kicked out" of a treatment group in March of 2014 (Pl.'s 11/9/14 affidavit; Plaintiff's request slips dated 3/14/14 and 3/24/14).  He also asserts, without elaboration, that this was "ordered by the court." (Pl.'s Resp. p. 2., para. 2.)

## ANALYSIS

Plaintiff is detained because he has been found to "suffer from a mental disorder that makes it substantially probable that . . . [he] will engage in acts of sexual violence." 725 ILCS 207/5(f)(definition of sexually violent person). While detained, he is constitutionally entitled to adequate treatment for his mental disorder, treatment which must be determined by a qualified professional exercising his or her professional judgment. Youngberg v. Romeo, 457 U.S. 307, 323 (1982). As long as the treatment decisions are within professional bounds, deference is owed to the treating professionals, even if the acceptable range of treatment might include other, better approaches. A professional's judgment may be disturbed only when that judgment is "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" Sain v. Wood, 512 F.3d 886, 895 (7th Cir. 2008)(quoted cite omitted); Allison v. Snyder, 332 F.3d 1076, 1081 (7th Cir. 2003)("As far as the Constitution is concerned, it is enough that judgment be exercised.") In other words, in order to be liable, the professional must have been deliberately indifferent to Plaintiff's

serious need for sex offender treatment.  *See* McGee v. Adams, 721 F.3d 474, 482 (7th Cir. 2013)(medical claim by Rushville resident).

**I.   The Court needs more information on the delay in Plaintiff's access to sex offender treatment from the time Plaintiff consented on September 2011, to the date he withdrew his consent.**

As the record now stands, Plaintiff signed a consent to treatment on September 19, 2011 and was told he would be put on a waiting list.  This delay amounted to, at most, four months, because Plaintiff does not dispute that he had withdrawn his consent by the following January.  Defendants do not address this delay, and they do not dispute Plaintiff's assertion that Plaintiff was told the delay was because of a lack of staff and other resources.

A significant delay in providing access to sex offender treatment might violate Plaintiff's constitutional rights if:  (1) Defendants were personally responsible for the delay; (2) Defendants had the ability to do something about the delay; and, (3) Plaintiff suffered harm as the result of the delay.  The Court cannot determine whether summary judgment is appropriate without a more developed record on these issues.

**II.   Other delays in Plaintiff's access to the sex offender treatment programs, to the extent attributable to Defendants,**

**amounted to the exercise of Defendants' professional judgment.**

Plaintiff asserts that the requirement that he complete a mentoring program was implemented only to delay his access to sex offender treatment. However, this decision was one for Plaintiff's treatment team to make, and Plaintiff has no admissible evidence that the decision fell outside of acceptable professional judgment. That other residents have not been required to complete a mentoring group is not evidence that Defendants failed to exercise their judgment. In Defendants' professional judgment, the mentoring group was necessary in light of Plaintiff's history of nonconsent and disciplinary problems, in order to ensure Plaintiff was ready to commit and be receptive to the sex offender treatment.

Plaintiff also asserts that his time spent on close status delayed his sex offender treatment. However, many of these times occurred during the period when Plaintiff had not consented to treatment, so they could not have affected Plaintiff's access to treatment. The Court cannot tell how many times Plaintiff was put in close status when he was participating in group therapy, how long he was kept out of group therapy, whether Plaintiff submitted

a request to participate in group therapy, and whether Plaintiff was permitted to work on therapy assignments in his room.

In any event, Plaintiff has no admissible evidence to dispute that the decision whether to allow a resident to participate in group therapy while on close status is decision committed to the professional discretion of his treatment team. According to Defendants, that decision depends on whether the resident is stable enough to participate productively and safely in group therapy. Plaintiff offers no evidence that the exercise of this discretion with regard to his close status fell outside acceptable bounds.

### III. The lack of a primary therapist did not amount to the lack of mental health treatment.

Plaintiff agrees that he has had access to therapists during his entire time at the facility. During the time he did not consent to treatment, he was not assigned a primary therapist once the facility changed to a "team" approach, but he still had access to therapists. He does not identify any mental health need that went untreated when he did not have a primary therapist, other than the sex offender treatment, which was due to his decision not to consent.

**IV. Defendants were not deliberately indifferent to a serious mental health need of Plaintiff regarding the suicide of another resident.**

Plaintiff asserts that he told a security aide that he needed to talk to a therapist, after being traumatized by the suicide of a resident across the hall. Looking at the record in the light most favorable to Plaintiff, Plaintiff was told to submit a request, a requirement that he had not had to follow before, and a requirement that was not in the handbook at the time.

This incident does not arise to a constitutional violation. Plaintiff has no evidence that Defendants themselves were personally aware that Plaintiff had asked to see a therapist or that Plaintiff was suffering from an emergent mental health need. Plaintiff admits that he did not file a request to see a therapist after the suicide because he believed that the requirement was unnecessary. Defendants were alerted to Plaintiff's concerns after Plaintiff filed a letter to Judge Myerscough. A therapist talked to Plaintiff, and Plaintiff felt better. In short, Defendants took the resident's suicide seriously, and they were not deliberately indifferent to Plaintiff's mental health needs.

Even if Defendants had refused to talk to Plaintiff when he asked, Plaintiff has no evidence that such a refusal put him at a substantial risk of serious harm. The Court does not doubt that Plaintiff felt traumatized, but he was able to go on a court writ the day after the event without incident, and there is no indication that Plaintiff expressed a desire to harm himself to anyone at the facility.

**V. Plaintiff has no evidence that the facility lacks procedures for Plaintiff to obtain help in the event he has a mental crisis.**

This claim cannot survive because, as discussed above, Plaintiff did not actually experience a serious mental health crisis to which Defendants were deliberately indifferent. In any event, Plaintiff does not dispute that, in the event of an emergency, residents may tell the security aides on the housing unit, who are then to inform the mental health staff. Plaintiff contends that this policy was not in writing when the resident across Plaintiff's hall committed suicide, but Plaintiff admits that the practice was in already in place at that time. According to Plaintiff, he did tell a security aide that he needed to talk to a therapist after the suicide, but, in contravention to established practice, the aide told Plaintiff

to submit a request. The failure of the guard to follow the practice, however, does not establish that no practice was in place.

**IT IS ORDERED:**

**(1) Defendants' motion for summary judgment is granted in part and denied in part (85). Summary judgment is denied, with leave to renew, on Plaintiff's claim about a delay in access to sex offender treatment after he consented to that treatment on September 19, 2011. Defendants' motion for summary judgment is otherwise granted.**

**(2) By April 30, 2015, Defendants shall file a supplemental motion for summary judgment on the remaining claim.**


ENTERED: March 17, 2015

FOR THE COURT:

**s/Tom Schanzle-Haskins**
TOM SCHANZLE-HASKINS
UNITED STATES DISTRICT JUDGE